**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **Pioneer Navigation Ltd.,** |
| **Petitioner** |
| **- against -** |
| **Chemical Equipment Labs, Inc.,** |
| **Respondent** |

**19 Civ. 02938 (DAB)**

**ECF case**

## RESPONDENT'S OBJECTIONS TO MAGISTRATE
## JUDGE'S REPORT AND RECOMMENDATION

LENNON MURPHY & PHILLIPS, LLC
Attorneys for Respondent
Chemical Equipment Labs, Inc.
The GrayBar Building
420 Lexington Ave., Ste. 300
New York, NY 10170
Tel. (212) 490-6050
Fax (212) 490-6070

Keith W. Heard

Of counsel

# TABLE OF CONTENTS

Page

**Preliminary Statement** ...........................................................................…..… 1

**Factual Background** .....................................................................…..….…..… 2

**The Charter Party's Force Majeure Clause** ………………………………….….. 7

**The Arbitration Award** ………………………………………………………..….. 8

**Arbitrator Sheinbaum's Dissent** ………………………………………………..…. 9

**The Report and Recommendation** …………………………………………..….. 11

**Legal Argument** ……………………………………………………………….. 11

   **POINT I**

   **THE MAGISTRATE JUDGE MISSTATED AND MISAPPLIED
   THE LAW ON ARBITRATORS EXCEEDING THEIR POWERS** ………....…... 11

   **POINT II**

   **THE MAGISTRATE JUDGE FAILED TO APPRECIATE THAT
   THE PANEL MAJORITY (a) ACTED IN MANIFEST DISREGARD
   OF THE CONTRACT AND OF THE LAW WHEN IT DISREGARDED
   THE PARTIES INTENTIONS, AS SET FORTH IN CLAUSE 52,
   AND (b) FAILED TO RECOGNIZE THAT THE ORDER BY THE
   VENEZUELAN GOVERNMENT WAS A CLASSIC EXAMPLE
   OF "RESTRAINT OF PRINCES."** ……………………………………………. 19

   **CONCLUSION**

   **FOR THE REASONS SET FORTH HEREIN, THIS HONORABLE
   COURT SHOULD REJECT THE MAGISTRATE JUDGE'S REPORT
   AND RECOMMENDATION, GRANT CEL'S MOTION TO VACATE
   THE ARBITRATION AWARD AND DISMISS THE PETITION TO
   CONFIRM** ……………………………………………………………….. 25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Pioneer Navigation Ltd.,

                  **Petitioner**

   **- against -**

Chemical Equipment Labs, Inc.,

                **Respondent**

**19 Civ. 02938 (DAB)**

**ECF case**

---

**RESPONDENT'S OBJECTIONS TO MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Respondent, Chemical Equipment Labs, Inc. ("CEL"), submits these Objections to the Report and Recommendation filed by Magistrate Judge Stewart Aaron on December 11, 2019.

**Preliminary Statement**

Petitioner Pioneer Navigation Ltd. ("Pioneer") filed this action on April 4, 2019 to seek confirmation of a maritime arbitration award. On April 30th, CEL filed a Motion to Vacate the fatally flawed award. By Order dated November 14th, Judge Batts referred the Motion to Vacate ("ECF No. 9 and all related submissions") to Magistrate Judge Aaron, who then filed his Report and Recommendation ("R&R") on December 11th. In the R&R, the Magistrate Judge recommended that "Petition be GRANTED, that Respondent's motion to vacate be DENIED and that the Final Award be CONFIRMED." R&R at 23 (ECF No. 24).

The applicable statute, 28 U.S.C. § 636(b)(1)(A), reads as follows:

> [A] judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except [certain matters not relevant here.] *A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.*

The statute also provides as follows:

1

Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. *A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.* The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (emphasis added).

In addition, Rule 72(a) of the Federal Rules of Civil Procedure provides as follows:

A party may serve and file objections to the order within 14 days after being served with a copy. . . . The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

CEL files these Objections pursuant to 28 U.S.C. § 636(b)(1)(A) and F.R.Civ.P. Rule 72(a).

### Factual Background

The award was issued in an arbitration that arose out of a charter party contract by which CEL chartered the M/V GENCO OCEAN from Pioneer to carry road salt from a load port in Venezuela to a discharge port on the U.S. East Coast. ECF No. 1-1. CEL was purchasing the salt from Servicios & Suministros Petroleras Y Gasiferos ("SSP&G"), a Panamanian corporation. SSP&G had arranged to buy the salt from Empresa Nacional Salinera ("ENASAL"), a unit or division of PDVSA Industrial, which was itself a division of Petróleos de Venezuela, S.A. ("PDVSA"), the Venezuelan state oil company. ECF No. 11-2 at ¶¶ 7 and 11 and No. 11-3, Exh. 4.

CEL's April 30, 2014 contract with SSP&G required SSP&G to load the road salt into CEL-nominated vessels "in Peninsula de Araya at Puerto Sucre Port, Venezuela." ECF No. 11-3, Exh. 4 at ¶ 5. In the contract, SSP&G "declare[d] that they have in their possession all necessary licenses and government permits for the exportation of the salt, including:

- Registro mercantil (Company registration)

- R.I.F. (fiscal registration)

- Certificado de Origen del producto (certificate of origin)

- Contract by PDVSA Industrial (contract with salt suppliers)

*Id.* at 1 (Preamble).

Over the next seven months, CEL purchased road salt and had it loaded on six different vessels for transportation to ports in the United States, including a vessel that loaded salt and left Venezuela less than a month before CEL and Pioneer agreed to the contract for the GENCO OCEAN. ECF No. 11-2 at ¶ 12. Significantly, Mr. Morgan testified in a declaration CEL submitted to the arbitrators in this matter on August 23, 2016 that "[o]n none of the vessels . . . did CEL encounter any significant problems. Everything went well." *Id.* at ¶ 5.

On December 4, 2014, CEL entered into a maritime charter party contract with Pioneer to have the M/V GENCO OCEAN transport 25,000 metric tons of salt in bulk from Araya, Venezuela to a discharge port in the Wilmington, Delaware / Baltimore, Maryland range. ECF No. 1-1. In addition to terms set forth in a "clean recap" email of December 4, 2014, the charter was otherwise subject to the terms of CEL's August 21, 2014 charter of the M/V UBC SALAVERRY "with logical alterations and amendments as per this recap." *Id.* at 3. By incorporating the terms of the UBC SALAVERRY charter, the contract for the GENCO OCEAN included a provision for arbitration in New York as well as a "Force Majeure Clause" in Clause 52. *Id.* at 7, 16 and 19-21.

The GENCO OCEAN arrived at Araya the morning of December 11, 2014 and began loading the salt cargo at 2100 hours that day. ECF No. 11-2 at ¶ 12. However, the vessel stopped loading by order of the SENIAT, the Venezuelan Customs authorities,[1] at 1120 on December 12th and

---

[1] According to a Venezuelan lawyer who investigated the matter for CEL, "SENIAT is the acronym for 'Servicio Nacional Integrado de Administración Aduanera y Tributaria,' which essentially translates as 'National Integrated

loading remained suspended until December 23rd, when Customs ordered the salt loaded on December 11-12th to be returned to the dock. *Id.* at ¶¶ 15, 36.

The information CEL received about the reason for the stoppage in cargo operations quickly became confusing. The initial indication through commercial channels was that the SENIAT had stopped loading because it had never authorized loading and exportation of the salt. *Id.* at ¶¶ 16-21. An email from the vessel's Master the day loading was stopped referred to the absence of a "Letter of Authorization" to load the salt, *id.* at ¶ 15, while an email from a cargo surveyor at the load port said "loading operations were stopped due to shippers not [having] prepared the customs documents." *Id.* at ¶ 16 and Exh. B-18. Meanwhile, an email from the vessel's load port agent near the end of December 12th said "[l]oading was stopped 1120hrs due to restrictions for exporting salt as per offical [sic] request from the custom main office." *Id.* at ¶ 20.

Late on December 12th, CEL learned from its cargo surveyor at Araya that "ENASAL people is [sic] trying to solving this through PDVSA head offices in Caracas." *Id.* at ¶ 20. Likewise, on December 16th, the vessel's agent in Venezuela sent an email advising that a meeting had been scheduled between PDVSA and Customs' "main office at caracas." *Id.* at ¶ 24. In his declaration to the arbitrators, Mr. Morgan explained that "[i]t seemed to me that, if PDVSA and Venezuelan Customs were meeting to discuss this situation, the problem must involve something other than an alleged failure [by the shipper, SSP&G] to have export permits in place."[2] *Id.*

---

Service for the Administration of Customs Duties and Taxes'." ECF No. 9, Castro declaration at ¶ 19.

[2] PDVSA is a major component of the Venezuelan economy, something that would have been well-known to the arbitrators in this matter. As explained in Wikipedia, "[s]ince its founding on 1 January 1976 with the nationalization of the Venezuelan oil industry, PDVSA has dominated the oil industry of Venezuela, the world's fifth largest oil exporter." https://en.wikipedia.org/wiki/PDVSA

Unfortunately, the high-level discussions in Venezuela's capital did not resolve the situation. On December 22, 2014, Richard Medina, the General Manager of the SENIAT's main office at the port of loading, issued an order in the form of a letter reading as follows:

> *WE HEREBY NOTIFY YOU THAT THIS CUSTOMS OFFICE, ACCORDING TO ITS EMPOWERMENT BY THE LAW OF CUSTOMS, REQUIRES THAT THE SALT FOR EXPORT IN BULK ON BOARD THE MV GENCO OCEAN, FLYING THE LIBERIAN FLAG, WHICH ARRIVED AT ARAYA ON DEC 11TH 2014, BE DISCHARGED WITHING THE NEXT 24 HOURS FROM THIS DATE AND TIME ONWARDS, SINCE LOADING OF SAID SALT WAS NOT AUTHORIZED BY THIS CUSTOMS OFFICE.*
>
> *YOURS FAITHFULLY*
>
> *RICHARD ANTONIO MEDINA GONZALEZ*
> *GENERAL MANAGER OF THE MAIN CUSTOMS OFFICE OF PUERTO SUCRE*

ECF No. 1-2, Award at 10; ECF No. 11-2, Morgan decl. at ¶ 36 and Exh. 39.

As a result of Mr. Medina's Discharge Order, the salt that had been loaded on the ship was returned to the pier. Petitioner reacted to the Customs' order by sending a message holding CEL liable for all expenses and damages arising out of the incident. CEL replied through its charter party broker that "[i]n Charterers' view the situation clearly falls under the terms of the CP Force Majeure Clause." ECF No. 11-2, Morgan decl. at ¶ 39, Exh. B-42. CEL and Petitioner tried to arrange agreeable alternative employment for the ship but, when that failed, CEL sent Petitioner an email reading in part as follows:

> Charterers confirm that they will not be able to perform the current voyage due to the interference of the government of Venezuela.
>
> Charterers continue to reserve all of their rights and take the view that Charterers' performance is excused under the explicit language of the CP.

*Id.* at Exh. B-44.

### The Arbitration Proceedings

There was no live testimony before the arbitrators. All of the evidence was submitted in writing, including a detailed, 23-page declaration with 57 exhibits (largely correspondence from the time of the event) from CEL's president and CEO Mr. Morgan on August 23, 2016.[3] In addition, CEL arranged for Eduardo Castro, an attorney with the law firm of Bermudez Nevett Mezquita Ontier in Caracas, to perform a factual investigation to determine once and for all why the Venezuelan government had intervened to prevent the salt from leaving the country on the GENCO OCEAN. Mr. Castro's 9-page declaration of November 17, 2017, to which was attached six exhibits totaling an additional 68 pages, was also submitted to the arbitrators. Petitioner submitted a declaration from one Frederik Wendelboe explaining how Petitioner calculated its alleged damages. However, Petitioner submitted no declaration countering attorney Castro's account of why the Venezuelan government blocked the cargo from leaving the country. As the Panel majority observed, "Dr. Castro's investigation was as thorough as difficult circumstances permitted." Petition, Exh. 2, Award at 20.

Attorney Castro traveled to Puerto Sucre, the port where GENCO OCEAN went to load the cargo, to see Richard Antonio Medina Gonzalez, the official who signed the SENIAT's discharge order. Mr. Castro met there with Mr. Medina and with Eugenio Marcano, the owner of a commercial agency named Carmelo Marcano C.A (Agencia Naviera y Aduanal), which assists

---

[3] Mr. Morgan explained that CEL lost a total of $806,049.00 due to the actions of the Venezuelan government. It lost profits on the GENCO OCEAN shipment in the amount of $599,049.00 and had to pay $207,000 "to buy higher-priced salt to meet obligations to its customers that were left uncovered when the shipment from Araya was blocked." ECF No. 11-2, Morgan decl. at ¶ 45. In addition, CEL's inability to deliver the salt to Baltimore caused it to lose credibility with a potential new customer, which Mr. Morgan said was "an incalculable loss." *Id.* at ¶ 46. Dissenting arbitrator Sheinbaum pointed out that, despite the Panel majority's alleged reliance on "commercial equity" in reaching its result, ECF No. 2, Award at 21, there was no "equity" in the Award since CEL had suffered major losses in this transaction and, unless the Award is vacated, will have to bear Petitioner's damages too. ECF No. 2, Dissent at 34, n. 23.

companies with the Customs process in Puerto Sucre. Mr. Castro learned that "SSP&G apparent-

ly hired Mr. Marcano to help with the exportation of the salt in this case." *Id.* at ¶ 13.

In his declaration, Mr. Castro described what he learned as follows:

> My meeting with these men lasted about an hour. Mr. Medina confirmed that the
> SENIAT was the government agency that took the decision to stop the exportation of
> the salt. According to Mr. Medina, the reason for the decision was because days before
> the ship loading was stopped, the Bolivarian National Intelligence Service (known as
> SEBIN) alerted him to be careful for ENASAL operations, after the Presidential
> Decree number 1190 (regarding banned exportation products) was enacted, out of a
> suspicion that ENASAL and its General Manager, Mr. Nestor Ramos, could be doing
> irregular exportations without authorization from PDVSA Industrial (ENASAL is a
> subsidiary of PDVSA Industrial, which is itself a subsidiary of PDVSA, our country's
> state-owned oil and natural gas company). Mr. Medina said he was told that ENASAL
> was doing this by using intermediary companies that were not substantial and had only
> been established for the purposes of these export transactions.

*Id*. at ¶ 16. According to this explanation (which Pioneer never rebutted), ENASAL, the state-

owned company that sold the road salt to SSP&G for re-sale to CEL, was suspected of engaging

in illicit or prohibited activities – viz., "doing irregular exportations without authorization from

PDVSA Industrial," ENASAL's corporate parent. *Id*.

Continuing, lawyer Castro explained that, when Mr. Medina asked Mr. Bolivar and Mr.

Morgado of SSP&G to produce documentation showing that their company was participating in

an authorized transaction, they could not do so. *Id*. at ¶¶ 17 - 18. "Finally," Mr. Castro learned,

"Mr. Medina with the support of the SEBIN and the SENIAT's Main Office in Caracas refused to

authorize the exportation and ordered the ship to unload the salt." *Id*. at ¶ 18.

### The Charter Party's Force Majeure Clause

The charter party contract between Petitioner and Respondent contained a Force Majeure

Clause which provided in relevant part as follows:

> Seller and Buyer shall be excused from the performance of any obligation hereunder
> when the cause of such non-performance is due to Force Majeure event or condition
> . . . . A Force Majeure event or condition shall be construed to include, without

limitation, . . . [a] breach of contract by seller's supplier and/or subcontractor, and any contingencies of like or different character beyond reasonable control of either party and interfering with production, supply, transportation or handling of the products covered herein, or restraint of princes, rulers or people; embargoes; . . . or withdrawal by the local authorities of any required export permit; or any other causes beyond the sellers with the buyers control what so ever; always provided that such events affect the parties or cargo; . . . or withdrawal by the local and government authorities of any required export permit; or any other causes beyond the sellers [control] or by compliance with any order or request of the United States government, or any officer, department, agency or committee thereof . . . .

ECF No. 1, Petition, Exh. 1 at 20-21 (pages 12-13 of the typed charter party rider).

To summarize, the SENIAT, part of the Venezuelan government, refused to allow the salt to be loaded on the GENCO OCEAN because it was being sold by ENASAL, another governmental entity, at a time when the SEBIN, an investigative arm of the government, was concerned that ENASAL's General Manager may been engaged in a course of illicit conduct. As stated in the Award, "ENASAL's General Manager Ramos was probably lining his pockets; SEBIN's investigation was wide-ranging and not just into this one salt transaction."  ECF No. 1-2 at 25.

### The Arbitration Award

The Award resulted from the fact that two of the three arbitrators (Messrs. Martowski and Ring) incorrectly decided that the Force Majeure Clause *did not exonerate* CEL for its inability to perform the charter party contract due to the Venezuelan government's decision that prevented the road salt from leaving the country.[4] The Panel majority exceeded its powers, in violation of 9 U.S.C. § 10(a)(4), by substituting its own definition of what constitutes Force Majeure for what the parties themselves had agreed in Clause 52 of their contract. In addition, the majority acted in manifest disregard of the law by ignoring the principle that contracting parties can reach their own allocation of the risk of non-performance and are free to define force majeure in whatever manner

---

[4] The arbitrators unanimously concluded that "Clause 52 is applicable to the Parties' rights and obligations," despite its references to "Seller and Buyer" since it was "clear that both parties intended to include a force majeure clause in their charter party as is customary in the [shipping] industry."  ECF No. 1-2, Award at 21.

they desire. The majority also acted in manifest disregard of the law by ignoring the time-honored, legal definition of "restraint of princes."

### Arbitrator Sheinbaum's Dissent

The Panel's Award was by no means unanimous as arbitrator Sheinbaum wrote a strenuous and stinging dissent. Mr. Sheinbaum concluded that CEL was excused from performance of the charter by several provisions in the Force Majeure Clause – i.e., "restraint of princes"; "withdrawal by the local authorities of any required export permit"; "contingencies . . . beyond reasonable control of either party and interfering with . . . supply, [ or] transportation . . . of the products covered herein . . . "; and, finally, "any other causes beyond the . . . [Charterer's] control what so ever." *Id.* at 34 (Dissent at 1). He found it ludicrous to believe that exportation of the salt was prohibited by something as basic and curable as the alleged absence of an export permit.[5] *Id.* at 41, 51-54 (Dissent at 8, 18-21). Mr. Sheinbaum roundly rejected the majority's position that the SEBIN and SENIAT's intervention with cargo loading should have somehow been "foreseeable" to CEL, pointing out that foreseeability must be assessed when the contract was agreed. *Id.* at 36-37, 59-60 (Dissent at 3-4, 26-27). There was absolutely no evidence before the Panel that, when the charter party here was agreed on December 4, 2014, CEL could have possibly foreseen that the Venezuelan government would have intervened as it did. *Id.* at 59-60 (Dissent at 26-27).

Mr. Sheinbaum was especially critical of the majority's unsupported view that, to be valid, a Force Majeure situation must involve "broad global or national policies or interests." *Id.* at 42 (Dissent at 9). Going further, he made the point that, even if this requirement were somehow valid,

---

[5] Unlike the majority, arbitrator Sheinbaum understood that "CEL has **never** offered or stated or taken the position herein that the cause of the government's order(s) was 'SSP&G's failure to provide export permits or authorization for the shipment'." ECF No. 1-2, Dissent at 7 (emphasis in original). Concluding that an export permit had undoubtedly been in place for the shipment, he observed that CEL was exonerated if the SENIAT had withdrawn or voided the permit since Clause 52 defines "withdrawal by the local authorities of any required export permit" as a Force Majeure event. *Id.* at 2, 20-21. Finally, arbitrator Sheinbaum stressed that, since CEL's purchase of the salt was done on Free on Board ("FOB") terms, SSP&G had the obligation to load the cargo on the vessel, not CEL. *Id.* at 18 n.9.

Venezuela's interest in fighting corruption and preventing "irregular and unauthorized" transactions involving governmental entities such as ENASAL easily satisfied the majority's supposed requirement. *Id.* at 45-46 (Dissent at 12-13). Mr. Sheinbaum explained that "[t]he specific and individual acts of SEBIN in warning Medina/SENIAT, and of Medina and SENIAT, in ordering the loading stoppage, ordering the discharge, and refusing to permit exportation of the salt . . . were interferences and interventions of the government and restraints of princes under Clause 52 and the law, and excused performance by CEL." *Id.* at 41 (Dissent at 8). He also made the point that, by ignoring this aspect of the contractually agreed Force Majeure Clause, the majority had concluded that "'restraint of princes' is allegedly to be discarded or, in effect, deleted from the Clause," which, in the proper exercise of their power as arbitrators, they could not do. *Id.* at 46 (Dissent at 13).[6]

### The Report and Recommendation

Magistrate Judge Aaron spent considerable time laying out the facts of the case and describing what happened in the arbitration. *See* R&R at 2-18 (ECF No. 24). However, he only spent one paragraph in stating what he viewed as the law that enables a party to obtain vacatur of an award "where the arbitrators exceeded their powers." 9 U.S.C. ¶ 10(a)(4). That single paragraph reads as follows:

> Under the FAA, a district court may vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The Second Circuit has "consistently accorded the narrowest of readings to the [FAA's] authorization to vacate awards [pursuant to § 10(a)(4)],

---

[6] The Magistrate Judge dismissed arbitrator Sheinbaum's detailed and persuasive dissent on the basis that he was a party-appointed arbitrator. However, this summary rejection of an experienced maritime lawyer and arbitrator's arguments and conclusions was inappropriate. If the conclusions of a party-appointed arbitrator are entitled to no weight, then one would expect a dissenting opinion in every arbitration because one party will always be the loser and, according to the analysis in the R&R, the arbitrator appointed by that party should be expected to dissent. However, a review of the published awards of the Society of Maritime Arbitrators, of which there are now well over 4,300, shows that that dissents are far from an everyday occurrence. *See, generally*, the awards of the Society of Maritime Arbitrators found on Lexis and Westlaw.

especially where that language has been invoked in the context of arbitrators' alleged failure to correctly decide a question which all concede to have been properly submitted in the first instance." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 220 (2d Cir. 2002) (quoting *In re Andros Compania Maritima S.A.*, 579 F.2d 691, 703 (2d Cir. 1978)) (brackets in original). Thus, regardless of whether the arbitrators properly decided an issue, a court will not vacate an arbitral award under Section 10(a)(4) unless the petitioner can show that the arbitrators lacked the authority to reach that issue.

R&R at 19. Significantly, the R&R contains no citation of any authority in support of the last proposition set forth above – i.e., that "a court will not vacate an arbitral award under Section 10(a)(4) unless the petitioner can show that the arbitrators lacked the authority to reach that issue." As will be seen, and with all due respect to the Magistrate Judge, that statement is not an accurate exposition of the law governing motions to vacate arbitration awards on the ground that "the arbitrators exceeded their powers."

In applying the law as he had stated it, the Magistrate Judge then concluded that "the Panel majority acted within its authority in construing the Charter provisions and presented a colorable justification for the outcome reached. *See Rich [v. Spartis]*, 516 F.3d at 81." R&R at 19.

The Magistrate Judge did a better job of summarizing the law on manifest disregard but, for reasons that will be explained below, proceeded to misapply that law.

## Legal Argument

### POINT I

### THE MAGISTRATE JUDGE MISSTATED AND MISAPPLIED
### THE LAW ON ARBITRATORS EXCEEDING THEIR POWERS.

The Magistrate Judge apparently misunderstood the thrust of CEL's argument in favor of vacatur under 9 U.S.C. § 10(a)(4).  He seemed to believe CEL was arguing the majority arbitrators "lacked the authority to reach" the issue that formed the basis of their Award. R&R at 19.[7]

---

[7] It is entirely possible that the Magistrate Judge was led astray by Petitioner's overly narrow summary of the law on vacatur applicable when arbitrators have "exceeded their powers." CEL exposed Petitioner's error on pages 2-5 of its

However, that was not the thrust – not the gravemen – of CEL's argument, which was instead that the Panel majority *ignored* what the parties had agreed in the charter party's Force Majeure Clause and applied their own "brand of industrial justice." *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). The full extent of CEL's argument that the majority arbitrators "exceeded their powers" is set forth in CEL's Memorandum of Law in Support of Respondent's Motion to Vacate Arbitration Award, which is incorporated herein by reference. See, especially, pages 16-22. ECF No. 10.

The issue presented by the Motion to Vacate based on section 10(a)(4) is not whether the arbitrators had the power to determine whether the contract's Force Majeure Clause relieved CEL of performance in light of the Venezuelan government's refusal to allow the salt cargo to leave the country. The issue was whether the Panel majority applied the clause, as written and as agreed by the parties, or whether they applied their own idea of what should constitute Force Majeure, which turned out to be something else entirely.

The charter party's Force Majeure Clause provided that the parties "shall be excused from the performance of any obligation hereunder when the cause of such non-performance is due to [a] Force Majeure event or condition." ECF No. 1-1 at 20-21 (pages 12-13 of the rider). The clause then *defines* Force Majeure to include, "without limitation," these specifically enumerated events:

1. [a] breach of contract by seller's [i.e., CEL's] supplier and/or subcontractor, and any contingencies of like or different character beyond [the] reasonable control of either party and interfering with production, supply, transportation or handling of the products covered herein;

2. restraint of princes, rulers or people;

3. withdrawal by the local and government authorities of any required export permit; and

4. or any other causes beyond the sellers . . . control what so ever [sic].

---

Reply Memorandum of Law in Further Support of its Motion to Vacate Arbitration Award, ECF No. 21, which is incorporated by this reference and to which the Court is respectfully referred.

Thus, the parties *agreed*, in their contract, that if performance by either one was prevented by any of these events, the non-performance would be excused.

It is beyond peradventure that SSP&G's failure to load the road salt on the GENCO OCEAN and do whatever was necessary to facilitate the cargo's exportation from Venezuela was a breach of the sales contract.  As arbitrator Sheinbaum pointed out in his dissent, the contract by which SSP&G agreed to sell the salt to CEL was on Free on Board ("FOB") terms. ECF No. 1-2 at 51 (Dissent at 18 n.9). Thus, SSP&G had the obligation to load the cargo on the vessel, not CEL.[8] Specifically, the contract by which CEL was buying the salt from SSP&G provided as follows:

> Material to be delivered Free On Board (FOB). Seller to secure at Seller's expense the material exportation and vessel loading.

ECF No. 11-3 at 13. Thus, SSP&G, the "supplier" to CEL was required to load the salt on the GENCO OCEAN and it failed to do so, thereby breaching the sales contract, giving CEL a defense under the Force Majeure Clause.

Going further, SSP&G's failure to arrange for the salt to be loaded on the vessel and exported from Venezuela constituted "contingencies of like or different character beyond [the] reasonable control of either party [i.e., CEL and Pioneer] and interfering with . . . supply, transportation or handling of the products covered herein."  Is that not obvious?  How could it be otherwise?

The Force Majeure Clause also exonerated CEL from performing the charter party due to "restraint of princes, rulers or people." ECF No. 1-1 at 20 (page 12 of the rider).  The law on what constitutes "restraint of princes" is, as required by the Second Circuit, "well-defined, explicit, and

---

[8] As noted by this Court in *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, No. 06 Civ. 3972, 2011 U.S. Dist. LEXIS 110716 at *10-11 (S.D.N.Y. Sept. 28, 2011), "'Free on Board' means that the seller delivers when the goods pass the ship's rail at the named port of shipment. This means that the buyer has to bear all costs and risks of loss or damage to the goods *from that point*" (emphasis added). In *Standard Casing Co. v. California Casing Co.*, 233 N.Y. 413, 416 (1922), the Court explained that "[t]he general rule is that, upon a sale f.o.b. the point of shipment, title passes from the seller at the moment of delivery to the carrier, and the subject of the sale is *thereafter* at the buyer's risk" (emphasis added).

clearly applicable." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007). In a Supplemental Memorandum requested by the Panel, CEL explained the law thusly:

> The most helpful and most complete explanation of "restraint of princes" Charterer has found appears in 1 *Carver's Carriage by Sea*, 175 (13th ed. 1982), where the author wrote as follows:

>> *Restraints of princes, rulers, and peoples covers* any forcible interference with the voyage or adventure at the hands of the constituted government, or ruling power of any country, whether done by it as an enemy of the state to which the ship belongs, or not. For example, *orders of government prohibiting or restricting the exportation or landing of goods*; quarantine regulations, embargoes, or restrictions on particular ships; blockades; confiscations of goods as contraband, and so forth. And the restraint may have been by acts which were not directed against the ship or goods; they may have been affected indirectly. (Emphasis added in second sentence.)

> The first sentence of the passage above was quoted with approval by the Second Circuit in *Lekas & Drivas, Inc. v. Goulandris*, 306 F.2d 426, 430 (2d Cir. 1962).

ECF No. 11-20, Heard decl,, Exh. O at 4 (emphasis added). *See also, Tweedie Trading Co. v. George D. Emery Co.*, 146 F. 618, 620 (S.D.N.Y. 1906)("Restraints of princes, rulers, and peoples covers . . . orders of government prohibiting or restricting the exportation or landing of goods").

The uncontradicted evidence before the Panel was the information set forth in attorney Castro's declaration that the SENIAT, an agency of the Venezuelan government, blocked exportation of the salt because the SEBIN, another agency of the national government, was concerned that ENASAL, yet another governmental entity, was engaging in what were described as "unauthorized exportations," using insubstantial intermediary companies. ECF No. 11-20, Heard decl. at Exh. D, ¶ 16. If nothing else, the SENIAT's action, prompted by the SEBIN's concern, constituted a "restraint of princes, rulers or people" and/or was a "cause beyond [CEL's] control." This is so basic, so elementary, and so straightforward that it is difficult to comprehend how the majority could have thought otherwise. *The only way* the majority arbitrators could escape those conclusions was by exceeding their powers and that is clearly what they did.

14

All the Panel had to do, in order to exercise its powers properly, was to determine whether the Venezuelan government's dramatic and unanticipated intervention to prevent the salt from leaving the country on the GENCO OCEAN came within the scope of one of the agreed causes in the Force Majeure Clause. But the majority arbitrators failed to do this. Instead, they created conditions *not found in the contract* in order for either party to rely on the Clause. In doing so, the majority clearly exceeded its powers, requiring that the Award be vacated.

The majority stated that for a contractual party to prove entitlement to a force majeure defense, it must prove the following elements:

(i) that an event is covered by the particular Force Majeure Clause;
(ii) the event's nonperformance was beyond CEL's control;
(iii) CEL's actions did not contribute to or cause the event;
(iv) the event did not result from a breach of CEL's obligations, and
(v) the event could not reasonably have been avoided or mitigated.

ECF No. 1-2, Award at 22. The majority erroneously concluded that CEL did not prove these elements.

In rejecting the argument that the SENIAT's shipment ban came within Clause 52, the majority relied on these immaterial or erroneous conclusions:

1. Mr. Morgan "was well aware of the inherent risks of doing business in Venezuela yet accepted them and took his chances in entering into CEL's contract with SSP&G." *Id.* at p. 26.

2. "[C]ommercial good sense should have alerted Mr. Morgan to question whether this was a *bona fide* transaction at its outset and at the very least, confirm with ENASAL's parent, PDVSA Industrial, that his deal [sic] was above board and authorized." *Id.* at 27.

3. Accepting a position argued by Petitioner, the majority agreed that "a governmental act and/or intervention" can only constitute a Force Majeure event if it "involve[s] broad global or national policies or interests." According to the majority, Force Majeure does not encompass "governmental regulatory acts . . . in respect to some irregularity or failure to attend to a known requirement involving individual parties' discreet commercial transactions." *Id.*

4. In a Force Majeure case, "the focus must not be on the [governmental] order itself, but rather on the cause of the underlying event or the reason for the intervention.  Only if the underlying event or reason motivating the intervention qualifies as a force majeure will the performance be excused." *Id*.

5. The legal authorities which CEL cited to the Panel which upheld the defenses of restraint of princes, force majeure (vis major), government interference and/or frustration, were "distinguishable from the facts and circumstances" of this case "since they involved legitimately unforeseen and unavoidable occurrences and the enforcement of broad global or national policies during times of war or crises and/or in furtherance of public safety or welfare."  *Id.*

These "points" have nothing to do with the parties' contractual agreement.

With respect to "1" above, Clause 52 does not establish, as a condition precedent, that the party seeking the clause's protection lack any concerns about the risk of doing business in a particular jurisdiction (and, looking at the five factors of a Force Majeure defense listed by the majority, the lack of a generalized "awareness of the risk" is not present.) With respect to "2," Clause 52 also does not require that the parties have absolute, unbridled confidence in the transaction they are undertaking or in all related transactions (such as CEL's purchase of the salt from SSP&G) in order to obtain the clause's protection.[9]

The Panel majority created a surreal Catch-22 for CEL, essentially ruling that, *since CEL had concerns about doing business in Venezuela and tried to protect itself by including the Force Majeure Clause in the charter party*, CEL thereby deprived itself of the ability to rely on the clause. That conclusion by the majority was completely contradictory and improperly denied CEL the benefit of the contract.

---

[9] The majority's after-the-fact advice that Mr. Morgan should have "confirm[ed] with ENASAL's parent, PDVSA Industrial, that his [sic] deal was above board and authorized" overlooks the fact that PDVSA was not involved in the contract negotiations. Mr. Morgan and CEL were dealing with ENASAL and SSP&G. Dissenting arbitrator Sheinbaum observed that the question the majority thought CEL should have asked PDVSA Industrial was a "commercially unrealistic question." ECF No. 2, Dissent at 28. (The undersigned, as CEL's attorney, explained to the Panel at oral argument on July 18, 2018 that "PDVSA Industrial did not control the salt. The salt mine was ENASAL's operation. ENASAL was selling to SSP&G and they sold to CEL."  ECF No. 11-23 at 121:22-24).

Looking at these two points another way, it makes perfect sense that anyone having concerns about doing business in a certain country, or with certain contractual counterparts, would seek protection by having a provision such as Clause 52 in a contract.[10] The majority exceeded its powers by depriving CEL of contractually agreed protections.

With respect to "3" above, Clause 52 does not provide or even suggest that "a governmental act and/or intervention" can only constitute a Force Majeure event if it "involve[s] broad global or national policies or interests." What it says is that non-performance by either party is excused if caused by "restraint of princes, rulers or people."[11] Apparently, the majority concluded that what the parties themselves had agreed was too broad and needed to be *limited* through the majority's addition of the "broad global or national policies or interests" proviso. In doing so, the majority arbitrators exceeded their powers. Their job was to apply the contract's terms to the dispute between the parties, not to impermissibly re-write it.

Likewise, there is no basis in Clause 52 for the majority's conclusion (item "4" above) that "the underlying event or reason motivating the [governmental] intervention [must also] qualif[y] as a force majeure" event. Moreover, the creation of this additional condition has no basis in law. Mr. Sheinbaum made this point quite strongly in his dissent where he wrote that a number of cases had been cited to the Panel in which "the defendants were excused from performance under their contracts by reason of the restraint of princes/governmental interference or governmental intervention language of the contract . . . [where] the underlying events or reasons for the

---

[10] The Sales Agreement by which CEL agreed to purchase the road salt from SSP&G also included a Force Majeure Clause.  ECF No. 11-3 at 14-15.

[11] In this case, the governmental act – the SENIAT's prevention of the salt from being exported to satisfy the SEBIN's concerns – did indeed involve a broad national policy and interest.  Governments around the world clearly have an interest in fighting graft and corruption, *see, e.g., McCutcheon v. FEC*, 572 U.S. 185, 227 (2010), and that is obviously what the SEBIN was concerned about with respect to ENASAL's "irregular" export transactions.  In fact, the majority understood this because it wrote that "ENASAL's General Manager Ramos was probably lining his pockets; SEBIN's investigation was wide-ranging and not just into this one salt transaction."  ECF No. 1-2 at 26, Award at 25.

intervention did not qualify as a force majeure." ECF No. 1-2 at 45, (Dissent at 12). He pointed out that, "[i]n all three [of these] cases the focus was not on the cause, context or environment in which the acts took place, but was on the acts of the government or government officers or agents." *Id.*

The final point of the five listed above is simply wrong. A number of the judicial decisions CEL cited to the Panel in which the defenses of restraint of princes or force majeure were allowed did indeed involve situations that were foreseeable. For example, in *M&Z Trading Corp. v. Hecny Group*, 41 Fed.Appx. 141 (9th Cir. 2002), where the court upheld a restraint of princes defense to exonerate the defendant for governmental seizure of a cargo, it was clearly foreseeable that, if contraband is found in a shipment during a Customs inspection, the cargo will be seized. In *Transatlantic Marine Claims Agency, Inc. v. M/V Ever Refine*, No. 96 Civ. 9141, 1997 WL 603806 (S.D.N.Y. Sept. 30, 1997), and in *Benjamin v. M.V. Balder Eems*, 639 F.Supp. 1497 (S.D.N.Y. 1986), cargo was damaged when the containers in which the goods were being shipped were subjected to Customs inspections. That too must be considered reasonably foreseeable.[12]

The majority revealed its true colors when it wrote the following:

> The basic purpose of a force majeure clause is to relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated. *A very harsh result.*

---

[12] The majority's statement that CEL's authorities were distinguishable from the instant situation because "they involved . . . the enforcement of broad global or national policies during times of war or crises and/or in furtherance of public safety or welfare" is also incorrect.  Neither *Reade v. Stoneybrook Realty, LLC*, 63 A.D.3d 433 (1st Dept. 2009), nor *Burnside 711, LLC v. Nassau Regional Off-Track Betting Corp.*, 67 A.D.3d 718 (2d Dept 2009), two of the cases CEL cited to the Panel (*see* ECF No. 11-3 at 25-16, Heard decl. Exh. O at 23-24), involved "broad global or national policies during times of war or crises." In *Reade,* the appellate court concluded that a TRO issued by the lower court that prevented a landlord from proceeding with construction necessary to deliver possession of certain premises to the tenant constituted "governmental prohibition," as that phrase was used in the force majeure clause of a commercial lease, thus giving the landlord additional time to perform. In *Burnside*, the appellate court determined that the amendment of a town ordinance to restrict the location of off-track betting parlors was "governmental action" within the terms of the force majeure clause in the rider to a lease.

ECF No. 1-2, Award at 22 (emphasis added). Exoneration from non-performance upon the occurrence of a defined Force Majeure event is not a "very harsh result" if, as here, that is what the parties agreed in their contract. The Panel's role was not to formulate its own subjective view of the equities, or what the parties *should* have agreed, or to mollify the effects of what the Panel might view as a harsh clause. As the Supreme Court made clear in *Oxford Health Plans LLC v. Sutter,* 569 U.S. 564, 569 (2013), "if the arbitrator acts outside the scope of his contractually delegated authority – issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract – . . . a court [may] overturn his determination."[13]

### POINT II

### THE MAGISTRATE JUDGE FAILED TO APPRECIATE THAT THE PANEL MAJORITY (a) ACTED IN MANIFEST DISREGARD OF THE CONTRACT AND OF THE LAW WHEN IT DISREGARDED THE PARTIES INTENTIONS, AS SET FORTH IN CLAUSE 52, AND (b) FAILED TO RECOGNIZE THAT THE ORDER BY THE VENEZUELAN GOVERNMENT WAS A CLASSIC EXAMPLE OF "RESTRAINT OF PRINCES."

In *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007), the Second Circuit explained the concept of "manifest disregard of the law" as follows:

> [A] court may vacate an award if it exhibits a "manifest disregard of the law." *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002) (quoting *DiRussa [v. Dean Witter Reynolds, Inc.],* 121 F.3d at 821). . . . An arbitral award may be vacated for manifest disregard only where a petitioner can demonstrate "both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case." *Wallace [v. Buttar]*, 378 F.3d at 189 (internal quotation marks omitted).

---

[13] Likewise, in *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 675 (2010), the Supreme Court said that "the panel simply imposed its own conception of sound policy" when it ordered class proceedings. But "the task of an arbitrator," the Court stated, "is to interpret and enforce a contract, not to make public policy." *Id.* at 672. In "impos[ing] its own policy choice," the panel in *Stolt-Nielsen* "thus exceeded its powers," requiring vacatur of its award. *Id.* at 677.

In reality, there are two types of manifest disregard. One, as explained in *Porzig*, is manifest disregard of the law. The other is "a notion of 'manifest disregard' to the terms of the agreement analogous to that employed in the context of manifest disregard of the law." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997). In *Yusuf*, the Court of Appeals went on to say that "[w]e will overturn an award where the arbitrator merely 'makes the right noises – noises of contract interpretation –' while ignoring the clear meaning of contract terms. *In re Marine Pollution Serv., Inc.*, 857 F.2d at 94." *Yusuf*, 126 F.3d at 25. "[V]acatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002).

In the instant case, CEL explained to the Panel that, *as a matter of law*, the parties were entitled to define Force Majeure in their contract and allocate the risk of non-performance as they saw fit. In its very first submission to the arbitrators, CEL wrote the following:

> Why Owner [i.e., Petitioner] believes it can escape the effect of the charter's agreed Force Majeure Clause is not clear.  As explained in *OWBR LLC v. Clear Channel Communications, Inc*., 266 F.Supp.2d 1214, 1222 (D. Hawaii 2003), a Force Majeure Clause is a "'contractual provision allocating the risk if performance becomes impossible or impracticable as a result of an event or effect that the parties could not have anticipated or controlled.'  Black's Law Dictionary 657 (7th ed.1999)."  *See also, Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 575, 580 (2d Cir. 1993), where the Second Circuit wrote that "a force majeure clause in a contract excuses nonperformance when circumstances beyond the control of the parties prevent performance."

> Such clauses are enforceable as a matter of law.  This is so because "the parties [to a contract] may provide as they wish with regard to how risks are divided." *Four Points Shipping and Trading, Inc. v. Poloron Israel, L.P.*, 846 F.Supp. 1184, 1188 (S.D.N.Y. 1994).  *See also, Matter of Westinghouse Elec. Corp. Uranium Contracts Litigation*, 517 F.Supp. 440, 459 (E. D. Va. 1981)(in a Force Majeure Clause, "the parties may agree . . . to allocate the various risks between them as they see fit.").

ECF No. 11-8, Heard decl., Exh. C at 10.[14]

The majority ignored these "well-defined, explicit, and clearly applicable" principles in disregarding what the parties agreed constituted grounds for excused non-performance in Clause 52. As has been shown herein, the majority substituted its own view of what constitutes Force Majeure, without regard to the fact that the parties whose contract empowered them to serve as arbitrators had its own specific enumeration of what events would excuse non-performance. In doing so, the majority acted in manifest disregard of the contract and in manifest disregard of the law that enabled the parties to "provide as they wish with regard to how risks are divided." *Four Points Shipping and Trading, Inc. v. Poloron Israel, L.P.*, 846 F.Supp. at 1188.

In a further manifest disregard of the law, the majority also ignored "well-defined, explicit, and clearly applicable" law on what constitutes "restraint of princes." In *Lekas & Drivas, Inc. v. Goulandris*, 306 F.2d 426, 430 (2d Cir. 1962), the Second Circuit explained that "'[r]estraints of princes, rulers, and peoples' covers *any* forcible interference with the voyage or adventure at the hands of the constituted government, or ruling power of any country, whether done by it as an enemy of the State to which the ship belongs, or not.' Carver's Carriage of Goods by Sea (10 ed.), 129." In a Supplemental Memorandum requested by the arbitration Panel, CEL made the Panel aware of the Second Circuit's statement of the law in *Lekas & Drivas*, which quoted with approval from the Tenth Edition of Carver's Carriage of Goods by Sea, a well-known maritime law treatise. ECF No. CEL then quoted the next sentence from the same section in Carver, which explains that "[r]estraints of princes, rulers, and peoples" includes "*orders of government prohibiting or restricting the exportation or landing of goods*; quarantine regulations, embargoes, or restrictions

---

[14] CEL also cited to the arbitrators the case of *Atlantic Richfield Co. v. ANR Pipeline Co.*, 768 S.W.2d 777, 781 (Tex. Ct. App. 1989)(emphasis added), in which a Texas state appellate court observed that "*the parties were at liberty to define force majeure in whatever manner they desired.*"  *See* Heard decl., Exh. O at 23.

on particular ships; blockades; confiscations of goods as contraband, and so forth." 1 *Carver's Carriage by Sea*, 175 (13th ed. 1982)(emphasis added). ECF No. 11-20 at 6 (Heard decl, Exh. O at 4). In addition, CEL quoted from and made the Panel aware of the ruling in *Tweedie Trading Co. v. George D. Emery Co.*, 146 F. 618, 620 (S.D.N.Y. 1906), where this Court also made it clear that "[r]estraints of princes, rulers, and peoples covers . . . orders of government prohibiting or restricting the exportation or landing of goods").

Here, of course, it is incontestable that the exportation of the shipment of road salt was prohibited by an order of the Venezuelan government. This was a classic instance of "restraint of princes," as defined by "well-defined, explicit, and clearly applicable" law which CEL laid out for the Panel. For the majority to simply ignore the clear law on this subject and conclude that an "order[] of government prohibiting or restricting the exportation . . . of goods" was somehow not a "restraint of princes" was to act in manifest disregard of the law, just as it exceeded its powers in acting in manifest disregard of Clause 52 of the contract, further requiring vacatur of the Award.

Skimming over CEL's arguments, as recounted above, the Magistrate Judge wrote simply that "CEL has not shown any relevant law that the Panel disregarded, let along manifestly disregarded." R&R at 22. That is incorrect. The Panel majority manifestly disregarded the law which provides quite clearly that, in a Force Majeure Clause, "the parties may agree . . . to allocate the various risks between them *as they see fit*." *Matter of Westinghouse Elec. Corp. Uranium Contracts Litigation*, 517 F.Supp. 440, 459 (E. D. Va. 1981)(emphasis added). Moreover, the majority's Award was in manifest disregard of the parties' agreement because "the arbitral award contradicts . . . express and unambiguous term[s] of the contract," as prohibited by law. *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002); *see also*, *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15. Finally, the majority manifestly disregarded the law that defines

"restraint of princes, rulers and peoples" as specifically including "orders of government prohibiting or restricting the exportation or landing of goods." *See*, *e.g.*, *Tweedie Trading Co. v. George D. Emery Co.*, 146 F. at 620.

The Magistrate Judge thought "[t]he Panel majority applied the correct law regarding force majeure," adding that "force majeure clauses do not protect against risks that are contemplated at the time of contract. *See Rand-Whitney Containerboard L.P. v. Town of Montville*, No. 96-CV-00413 (HBF), 2005 U.S. Dist. LEXIS 22796, *9 (D. Ct. 2005)." R&R at 22. However, that statement in the Report and Recommendation is incorrect because it is overly broad. In *Rand-Whitney,* the Connecticut Department of Environmental Protection ("DEP") denied the Town of Montville's application for a permit to segregate Rand-Whitney's waste stream. The Town argued the denial of its application excused further performance of its contract with Rand-Whitney under the terms of the force majeure clause. Plaintiff Rand-Whitney argued the clause was inapplicable because "[s]ince the moment the Supply Agreement was signed . . . both parties were aware of the need for permits." *Rand-Whitney Containerboard* at *5. In addition, "under the terms of the contract, [the Town of Montville] took on the responsibility to obtain all necessary permits, including future permits from the DEP." *Id.* at *3. The Court concluded a defense based on the force majeure clause was unavailable because allowing the defense would render void another provision in the contract by which the Town had specifically agreed it "shall obtain all permits necessary to construct the Project and to operate the Pipelines and the Pre-Treatment Facility and shall ensure that the Project is constructed and operated in compliance with all Environmental Laws and Permits." *Id.* at *10-11.

Thus, in *Rand-Whitney*, the defendant town knew before it agreed to the contract that it had the obligation of obtaining permits from the DEP and, in the contract, it specifically undertook the

burden of doing so. That specific requirement obviously prevented the town from relying on more general provisions in the force majeure clause. Here, on the other hand, both parties had a generalized knowledge, before agreeing to the charter party contract, that Venezuela could be a troublesome jurisdiction. On or about November 19, 2014, less than a month before the parties agreed on the contract at issue, Assuranceforeningen Skuld, Pioneer's third-party liability insurer, advised Pioneer and its other assureds that "Venezuela has . . . undergone a period of political and social upheaval in recent years which have affected imports, exports as well as the general conditions for making a port of call in this country."[15] ECF No. 11-7 at 128.

In the declaration he submitted to the Panel, CEL's president and CEO Mr. Morgan testified as follows:

> CEL had insisted that the Force Majeure Clause be included in the charter to cover situations such as this, in case they arose. The same clause can be found in each of the charters we entered into for lifting road salt out of Venezuela. The political situation there was simply too unpredictable for anyone such as CEL to bear the risk of a change in the Government's attitude. There had to be a provision in the charter protecting CEL against developments such as occurred in this case. The shipowner agreed to the clause and I think they should be bound by it.

ECF No. 11-2, Morgan decl. at ¶ 39. Like Pioneer, CEL had a generalized apprehension about what might happen in Venezuela but there was no evidence before the Panel that CEL was specifically concerned that the Venezuelan government might intervene to prevent exportation of the salt because of a concern that ENASAL's General Manager was corrupt. Indeed, the real reason for the government's action was not determined until attorney Castro conducted his investigation in 2016. ECF No. 11-11 at 23. What the Magistrate Judge and the Panel majority fail to explain is how CEL could have foreseen in 2014 something it did not learn until two years later. Thus, CEL is left with the situation where, because it was generally concerned about doing business in

---

[15] There was no evidence before the Panel that Pioneer shared this information with CEL. *See* Award at ECF No. 1-2. Presumably, Pioneer, like CEL, felt protected by the Force Majeure Clause in the charter party contract.

Venezuela and decided to protect itself by including a Force Majeure Clause in the charter party contract, it cannot rely on that clause because, in fact, it was concerned about doing business in Venezuela. This bizarre situation has been brought about because the Panel majority "exceeded its powers," within the meaning of 9 U.S.C. § 10(a)(4), and because it manifestly disregarded "express and unambiguous term[s] of the contract," *Westerbeke*, 304 F.3d at 222, and because it manifestly disregarded the law on what constitutes "restraint of princes." The Report and Recommendation failed to appreciate these fatal flaws in the Award and should be rejected by the District Judge, who should now grant CEL's Motion to Vacate the Award.

## CONCLUSION

**FOR THE REASONS SET FORTH HEREIN, THIS HONORABLE COURT SHOULD REJECT THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, GRANT CEL'S MOTION TO VACATE THE ARBITRATION AWARD AND DISMISS THE PETITION TO CONFIRM.**

Respectfully submitted,

LENNON, MURPHY & PHILLIPS LLC
Attorneys for Respondent
Chemical Equipment Labs, Inc.


By: s/   *Keith W. Heard*

kwh@lmplaw.net

The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
(212) 490-6050